# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## CA 09-1076

**JAMES JEFFERSON PRICE, IV, ET UX.**

**VERSUS**

**ERBE USA, INC., ET AL.**

**\*\*\*\*\*\*\*\*\*\***
APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2003-000319
HONORABLE RICK BRYANT, DISTRICT JUDGE
**\*\*\*\*\*\*\*\*\*\***

**JIMMIE C. PETERS**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, Jimmie C. Peters, and Billy H. Ezell, Judges.

**AFFIRMED.**

**Cooks, J., dissents and assigns written reasons.**

**Daniel E. Broussard, Jr.**
**Broussard, Halcomb & Vizzier**
**912 5ᵗʰ Street**
**P.O. Box 1311**
**Alexandria, LA 71309-1311**
**(318) 487-4589**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
     **James Jefferson Price, IV**
     **Jena Broussard Price**

**Richard B. Cappel**
**Raggio, Cappel, Chozen & Berniard**
**1011 Lakeshore Drive**
**Fifth Floor**
**Lake Charles, LA 70601**
**(337) 436-9481**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **Dr. Charles T. Humphries**

John E. Bergstedt
J. Gregory Bergstedt
Jodi C. Andrews
The Bergstedt Law Firm
One Lakeshore Drive, Suite 800
Lake Charles, LA 70629
(337) 436-4600
COUNSEL FOR DEFENDANTS/APPELLEES:
Dr. Francis X. Bride
Preferred Professional Insurance Company

**PETERS, J.**

The plaintiffs in this medical malpractice action, James J. Price, IV, and Jena Broussard Price, appeal the trial court judgment rejecting their claims for damages against the defendants, Dr. Charles Humphries and Dr. Francis Bride. For the following reasons, we affirm the trial court judgment in all respects.

## DISCUSSION OF THE RECORD

This litigation arises from the unintentional consequences of a January 17, 2002 procedure performed at St. Patrick Hospital in Lake Charles, Louisiana. On that day, Dr. Charles Humphries, a Lake Charles, Louisiana family practitioner, performed a scheduled screening colonoscopy on James J. Price, IV.[1] Early in the procedure, Dr. Humphries detected the presence of several polyps in the colon. He immediately aborted the screening procedure, and Dr. Francis Bride, a Lake Charles, Louisiana gastroenterologist, stepped in to surgically excise the polyps. Dr. Bride removed three of the four polyps without incident during the polypectomy using an electro-cautery snare. However, when removing the fourth, the electro-cautery snare malfunctioned, causing a deeper burn of the colon than Dr. Bride desired.

In response to the unintended burn, Dr. Bride performed a detailed visual inspection of the area to rule out the possibility of an acute perforation of the colon. He found no perforation through his visual inspection, but ordered flat and upright abdominal x-rays to detect the presence of any free air—an indication of a perforation. These x-rays were negative for any danger signs. Still, Dr. Bride extended Mr. Price's stay in the hospital to rule out any perforation, then released him to go home.

When on January 18, 2002, Mr. Price began to experience symptoms consistent

---

[1] In 2001, Mr. Price had seen Dr. Michael Seep, a Lake Charles, Louisiana physician at the Family Medical Center, complaining of occasional diarrhea. Dr. Seep recommended that Mr. Price undergo a screening colonoscopy. Since Dr. Seep did not perform colonoscopies, he recommended Dr. Humphries, another family practitioner at the Family Medical Center.

with a perforation, Dr. Humphries directed him to the emergency room at St. Patrick's Hospital. Tests at the emergency room confirmed the presence of a perforation, and Dr. Ron Kober, a Lake Charles, Louisiana surgeon, recommended that the perforation initially be treated with antibiotics in the hope it would seal without the necessity of surgery. This approach proved unsuccessful, and two days later Dr. Ken Moss, another Lake Charles, Louisiana surgeon, surgically repaired the perforation.

On January 12, 2005, Mr. and Mrs. Price brought a medical malpractice action against Drs. Humphries and Bride and St. Patrick's Hospital. The claims were first submitted to a medical review panel, as required by La.R.S. 40:1299.47, and the panel absolved all three defendants of any liability. When the matter ultimately went to trial on November 3, 2008, only the two doctors remained as defendants.

The four-day jury trial addressed two issues: (1) whether the two doctors obtained Mr. Price's consent to the polypectomy procedure, and (2) whether Mr. Price received appropriate post-procedure care. The jury found in favor of the doctors on both issues, and this appeal followed. On appeal, Mr. and Mrs. Price have limited their arguments to the question of consent. In doing so, they have asserted seven assignments of error:[2]

> 1. The jury erred as a matter of law in finding that Dr. Humphries obtained the proper consent from Mr. Price to perform a polypectomy when that doctor did not perform that procedure in his practice.
>
> 2. The jury erred as a matter of law in finding that Dr. Bride obtained the proper consent from Mr. Price to perform a polypectomy.
>
> 3. The jury committed manifest error in finding Dr. Humphries obtained the proper consent from Mr. Price to perform a polypectomy when that doctor did not perform that procedure in his practice.

---

[2]In their reply brief the plaintiffs attempt to assert an additional assignment of error, arguing that "[t]he trial court erred in failing to include in its jury charge Subsection E(7)(c) of the Louisiana Uniform Consent Law, LSA-R.S. 40:1299.40." However, an appellant's reply brief must be "strictly confined to rebuttal of points urged in the appellee's brief." Uniform Rules–Courts of Appeal, Rule 2-12.6. Accordingly, we do not address this issue.

2

4. The jury committed manifest error in finding Dr. Bride obtained the proper consent from Mr. Price to perform a polypectomy.

5. The trial court erred in allowing a family practice physician and an internist to testify as expert witnesses in the trial over Mr. Price's objection when both physicians testified they did not perform colonoscopies and/or polypectomies in their practice.

6. The trial court erred in referring to the locality rule contained in La.R.S. 9:2794(A)(1) in its jury charge over an objection.

7. The jury erred in failing to award damages to Plaintiffs.

**OPINION**

*ASSIGNMENTS OF ERROR NUMBERS
ONE, TWO, THREE, FOUR, AND FIVE*

The plaintiffs' first five assignments of error address whether Mr. Price gave an informed consent for the polypectomy to be performed. In their fifth assignment of error the plaintiffs assert that the trial court erred in allowing two of the defendants' expert witnesses to testify on the issue of consent. In their first and third assignments of error the plaintiffs address whether Dr. Humphries obtained Mr. Price's consent. Specifically, the plaintiffs do not contend that Dr. Humphries failed to obtain consent to perform a colonoscopy. Instead, they argue that Dr. Humphries failed to disclose that a polypectomy might take place during the colonoscopy if polyps were found. In their second and fourth assignments of error, the plaintiffs argue that Dr. Bride did not obtain consent to perform the polypectomy.

The medical treatment consent requirements are found in La.R.S. 40:1299.40, and in January of 2002,[3] that statute provided three ways a medical provider could obtain consent. The first of the three required the medical provider to obtain a handwritten consent to the proposed medical treatment. La.R.S. 40:1299.40(A)(l).[4]

_____

[3]We will apply the version of the statute in effect in January of 2002, when Mr. Price's treatment took place.

[4]On January 17, 2002, La. R.S. 20:1299.40(A)(1) provided, in pertinent part, "Notwithstanding any other law to the contrary, *written consent to medical treatment means a*

3

The patient was required to acknowledge in the handwritten consent that he or she had been informed "in general terms the nature and purpose of the procedure" and of the "known risks" associated with the procedure, and that the patient had an adequate opportunity to have all questions "answered in a satisfactory manner." *Id.* The consent obtained in that manner was "presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts." *Id.*

Louisiana Revised Statutes 40:1299.40(C) provided in January of 2002 that consent secured "other than in accordance with Subsection A" would also stand muster if the information required in La.R.S. 40:1299.40(A)(1) was made available to the patient and the patient had the opportunity to have all questions "answered in a satisfactory manner." The primary difference between consent obtained under La.R.S. 40:1299.40(C) and that obtained under La.R.S. 40:1299(A) is that the former does not carry the presumption afforded a handwritten consent. Instead, proof of consent obtained under La.R.S. 40:1299.40(C) "is subject to proof according to the rules of evidence in ordinary cases."

Finally, La.R.S. 40:1299.40(E) established a third option whereby a physician could obtain informed consent for medical treatment by availing himself of a list of risks for the treatment or procedure involved, prepared by the Louisiana Medical Disclosure Panel, a panel "created within the [Louisiana] Department of Health and Hospitals to determine which risks and hazards related to medical care and surgical procedures must be disclosed by a physician or other health care provider to a patient or person authorized to consent for a patient and to establish the general form and

_____

*handwritten consent* to any medical or surgical procedure or course of procedures . . . ." In 2008, La.R.S. 20:1299.40(A)(1) was amended to read "Notwithstanding any other law to the contrary, *written consent to medical treatment means the voluntary permission of a patient, through signature, marking, or affirmative action though electronic means pursuant to R.S. 40:1299.40.1,* to any medical or surgical procedure or course of procedures . . . ." Acts 2008, No. 738, § 1.

4

substance of such disclosure." La.R.S. 40:1299.40(E)(3)(a).[5] The physician or health care provider attempting to obtain consent by utilizing the lists prepared by the panel was still required to "disclose to the patient, or person authorized to consent for the patient, the risks and hazards involved in that kind of care or procedure." La.R.S. 40:1299.40(E)(5). Additionally, as the statute read in January of 2002:

> Consent to medical care that appears on the panel's list requiring disclosure shall be considered effective under this Subsection, if it is given in writing, signed by the patient or a person authorized to give the consent and by a competent witness, and if the consent specifically states, in such terms and language that a layman would be expected to understand, the risks and hazards that are involved in the medical care or surgical procedure in the form and to the degree required by the panel under Paragraph (4) of this Subsection.

La.R.S. 40:1299.40(E)(6).

Use of the panel's form and list of risks leads to "a rebuttable presumption," similar to that provided for under La.R.S. 40:1299.40(A), that the statutory requirements were complied with. La.R.S. 40:1299.40(E)(7)(a)(i). Furthermore, in the case of consent through the use of the panel's form and list of risks, "this presumption shall be included in the charge to the jury." *Id.* A primary difference between consent under this section and both of the other consent procedures available in January of 2002, is that "[i]n order to be covered by the provisions of [La.R.S. 40:1299.40(E)], the physician or other health care provider *who will actually perform* the contemplated medical or surgical procedure *shall*" give the disclosures required. La.R.S. 40:1299.40(E)(7)(c) [emphasis added].

With these consent choices in mind, we turn to an evaluation of the evidence presented on this issue. This evidence consists primarily of the testimony of the parties and four expert witnesses: Dr. Kurt Ward Cofran, a Shreveport, Louisiana

---

[5]In 2008, La.R.S. 40:1299.40(E) was amended to substitute the secretary of the Department of Health and Hospitals for the Louisiana Medical Disclosure Panel. Acts 2008, No. 815, § 3.

family physician and member of the medical review panel; Dr. Bryan Barilleaux, a Lake Charles, Louisiana internist; Dr. Stephen M. Person, a Lafayette, Louisiana gastroenterologist who also served on the medical review panel; and Dr. Eugene A. Trowers, Jr., a Tallahassee, Florida gastroenterologist and professor of clinical sciences and internal medicine at Florida State University, College of Medicine. The evidence establishes without contradiction that Mr. Price and Dr. Humphries discussed some particulars of the proposed colonoscopy at Mr. Price's first visit to the doctor on January 4, 2002. However, the specifics of that discussion are in dispute.

On the one hand, Mr. Price testified that Dr. Humphries did explain the benefits of having a colonoscopy but did not mention polyps or the possibility of any other physician being involved in the procedure. On the other hand, he contradicted himself by testifying that at the first meeting, Dr. Humphries told him that he was a family physician and did not remove polyps. According to Mr. Price, the end result of that conversation was that he, at no point, authorized Dr. Humphries to remove any polyps, nor did he knowingly give consent to allow any other doctor to perform procedures on him. Mr. Price testified he believed the colonoscopy procedure was simply a "screening" or "scanning" procedure.

Dr. Humphries testified that at the January 4, 2002 office visit, he explained exactly what would occur during the colonoscopy and what he intended to accomplish by the procedure—and that the possible discovery and removal of polyps were specifically discussed. According to Dr. Humphries, he explained to Mr. Price that he would not remove the polyps if any were discovered, and that he would call in a gastroenterologist to remove them. Dr. Humphries testified that he told Mr. Price he could choose the gastroenterologist, but that he (Dr. Humphries) usually retained

6

the services of Dr. Bride. According to Dr. Humphries, Mr. Price specifically selected Dr. Bride.

Both Mr. Price and Dr. Humphries agree that Mr. Price was provided with a standard medical pamphlet on January 4, 2002, which explained in detail the nature of the colonoscopy procedure and the possible risks. The pamphlet included a paragraph that explained:

> If your doctor sees anything abnormal during the exam, he or she may take small samples of tissue through the colonoscope for lab tests. The doctor may be able to remove any abnormal areas, *polyps*, or small tumors from the colon through the colonoscope. This may help you avoid having another procedure to remove them. [Emphasis added.]

While acknowledging receipt of the pamphlet, Mr. Price testified that he did not read it.

The evidentiary record contains two different forms purportedly signed by Mr. Price on the morning of January 17, 2002. The first is entitled "**MATERIAL RISKS IDENTIFIED BY THE LOUISIANA MEDICAL DISCLOSURE PANEL**" (hereinafter referred to as the "first form"), which identified the procedure to be performed as a "SIGMOIDOSCOPY/COLONOSCOPY" and listed the following material risks associated with the procedure:

1. Infection.
2. Bleeding which may require transfusion and/or surgery.
3. *Perforation of colon* or rectal wall which may require surgery.
4. Cardiac arrhythmias (irregular heartbeat).
(Emphasis added.)

The signatures of Dr. Humphries, Mr. Price, and a nurse witness follow the listing of material risks. The form reflects an execution time of 9:30 a.m.

The other form is a two-page document entitled "**PATIENT CONSENT TO MEDICAL TREATMENT OR SURGICAL PROCEDURE AND ACKNOWLEDGMENT OF RECEIPT OF MEDICAL INFORMATION**"

7

(hereinafter referred to as the "second form"). It also reflects a 9:30 a.m. signing time and purports to bear the signatures of Dr. Humphries, Mr. Price, and the same nurse witness who signed the first form.

The lead paragraphs of this second form read as follows:

**TO THE PATIENT:** You have been told that you should consider medical treatment/surgery. Louisiana law requires us to tell you (1) the nature of your condition, (2) the general nature of the medical treatment/surgery, (3) the risks of the proposed treatment/surgery, as defined by the Louisiana Medical Disclosure Panel or as determined by your doctor, (4) reasonable therapeutic alternatives and material risks associated with such alternatives, and (5) risks of no treatment.

You have the right, as a patient, to be informed about your condition and the recommended surgical, medical or diagnostic procedure to be used so that you may make the decision whether or not to undergo the procedure after knowing the risks and hazards involved.

In keeping with the Louisiana law of informed consent, you are being asked to sign a confirmation that we have discussed all these matters. We have already discussed with you the common problems and risks. We wish to inform you as completely as possible. Please read the form carefully. Ask about anything you do not understand, and we will be pleased to explain.

Under the category "**Treatment/Procedure**," the second form states in general:

Sigmoidoscopy/Colonoscopy with possible biopsy *and/or polypectomy*, coagulation, injection, banding of bleeding sites and/or dilation of rectum/colon with/without conscious sedation. Also, photographs may be taken for documentation purposes. (Emphasis added.)

This description is made more specific under subsection (2)(a) of the second form, which reads as follows:

**Description, nature of the treatment/procedure**: Screening Colonoscopy.
Look in the colon with a lighted scope, take pieces of tissue for study, *remove polyps*, stop bleeding by coagulation, injection or banding and possible dilating colon and/or rectum with/without conscious sedation. (Emphasis added.)

Dr. Humphries testified that before Mr. Price was sedated for the colonoscopy, he again discussed the procedure with his patient and reviewed the information

8

provided by the heretofore described forms. Mr. Price testified that he remembered none of the discussion surrounding the conversation with Dr. Humphries on the morning of January 17, 2002; did not read the forms; and did not remember signing the forms.

### *Admissibility of the Testimony of Dr. Cofran And Dr. Barilleaux*

The plaintiffs assert that the trial court erred in allowing Dr. Cofran and Dr. Barilleaux to testify as expert witnesses for the defendants.

The admissibility of expert testimony is generally governed by La.Code Evid. art. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

A trial court's determination of whether an expert meets these qualifications and whether he or she is competent to testified in a specialized area is subject to the abuse of discretion standard of review. *Cheairs v. State ex rel. DOTD*, 03-680 (La. 12/3/03), 861 So.2d 536.

The basis of the plaintiffs' objection to both doctors, below and on appeal, is that they do not perform colonoscopies and/or polypectomies in their practice. The plaintiffs argue that this means that they were not qualified to testify as experts under La.R.S. 9:2794(D), which governs the qualifications of expert witnesses who testify on the standard of medical care in malpractice lawsuits.[6]

---

[6] Louisiana Revised Statutes 9:2794(D) provides:

> (1) In a medical malpractice action against a physician, licensed to practice medicine by the Louisiana State Board of Medical Examiners under R.S. 37:1261 et seq., for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who meets all of the following criteria:

9

On October 20, 2008, the plaintiffs filed a motion *in limine*, seeking to preclude "Opinion testimony by Internist Physicians concerning the standard of care in securing consent to perform colonoscopies if, in fact, said physicians do not perform colonoscopies in their practice." On November 3, 2008, the trial court denied the plaintiffs' motion, ruling that both Dr. Cofran and Dr. Barilleaux could testify.

At trial, the trial court accepted Dr. Cofran as an expert in family medicine, but limited his testimony to the issue of consent.[7] Because Dr. Cofran was a member of

---

(a) He is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose.

(b) He has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim.

(c) He is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of care.

(d) He is licensed to practice medicine by the Louisiana State Board of Medical Examiners under R.S. 37:1261 et seq., is licensed to practice medicine by any other jurisdiction in the United States, or is a graduate of a medical school accredited by the American Medical Association's Liaison Committee on Medical Education or the American Osteopathic Association.

(2) For the purposes of this Subsection, "practicing medicine" or "medical practice" includes but is not limited to training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians.

(3) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness is board certified or has other substantial training or experience in an area of medical practice relevant to the claim and is actively practicing in that area.

(4) The court shall apply the criteria specified in Paragraphs (1), (2), and (3) of this Subsection in determining whether a person is qualified to offer expert testimony on the issue of whether the physician departed from accepted standards of medical care.

(5) Nothing in this Subsection shall be construed to prohibit a physician from qualifying as an expert solely because he is a defendant in a medical malpractice claim.

[7]When the defendants presented Dr. Corfan as an expert witness, it was brought out that Dr. Corfan has practiced as a family physician since 1973, maintaining his practice in Shreveport since April of 2003, and is board certified in family practice. Dr. Corfan was a member of the medical review panel–the first time that he had served as a member of a medical review panel–and this was the first time that he had testified as an expert in a medical malpractice case. Dr. Corfan testified

10

the medical review panel in this case, he was properly allowed to testify at trial. La.R.S. 40:1299.47(H).

When Dr. Barrileaux was offered as an expert witness for the defendants, he testified that he graduated from Tulane Medical School in 1984 and performed his residence in internal medicine at the Ochsner clinic from 1984 to 1987. He taught at the residence program in family practice at the Lake Charles Memorial Hospital for approximately five years, and now has a private practice in internal medicine in Lake Charles. Dr. Barrileaux is board certified in both emergency medicine and internal medicine. He testified that although he had assisted in a few colonoscopies during his training, he did not perform colonoscopies, instead referring his patients to a gastroenterologist. However, Dr. Barrilleaux testified that he felt confident testifying concerning whether Dr. Humphries had met the applicable standard of care for obtaining an informed consent to a colonoscopy and a polypectomy.

Our supreme court has recognized that La.R.S. 9:2794 requires that the expert "satisfy the trial judge that he or she is qualified to give testimony regarding the applicable standard of care." *Piazza v. Behrman Chiropractic Clinic, Inc.*, 601 So.2d 1378, 1382 (La.1992). Here, the question at issue was the standard of care that is expected of a family practitioner when obtaining a patient's informed consent. Based on Dr. Barrilleaux's experience and qualifications, we find that the trial court did not abuse its discretion in allowing Dr. Barrileaux to testify as an expert in internal medicine, specifically on the standard of care in obtaining a patient's informed consent.

We find no merit in the assignment of error addressing the testimony of these

_____

that he does not do colonoscopies or polypectomies in his practice, instead referring such procedures to a gastroenterologist, although some time between 1968 and 1970 he spent six months doing an internal medicine rotation while he studied for his Doctor of Medicine degree in Upstate Medical Center in Syracuse, New York. However, Dr. Corfan testified that he was competent to testify on the issue of whether there was informed consent for the colonoscopy and the polypectomy.

11

two physicians.

### *Issue of Consent as it Applies to Dr. Humphries*

The particulars of the first form meet the requirements of La.R.S. 40:1299.40(E). Because it is signed by Dr. Humphries, Mr. Price,[8] and a witness, Dr. Humphries is entitled to a presumption that he obtained a valid consent to the stated treatment and the procedure associated therewith. La.R.S. 40:1299.40(E)(7)(a)(i). Mr. Price's explanation that he did not actually read the consent form does not defeat that presumption. *See Descant v. Admin. of Tulane Ed. Fund*, 95-2127 (La.App. 4 Cir. 1/21/98), 706 So.2d 618, *writ denied*, 98-467 (La. 4/3/98), 717 So.2d 1131.

With regard to the plaintiffs' evidentiary burden to overcome the statutory presumption, this court has held that

> [a] presumption of proper consent may be rebutted if the plaintiff establishes certain factors. Though these factors have been stated slightly differently among the cases on the issue, they generally are: (1) the existence of a material risk which the physician must disclose, (2) the failure of the physician to inform the patient of a material risk, (3) the realization of the material risk, and (4) a causal connection between the failure to inform the patient of the risk and realization of the risk.

*Parker v. Harper*, 01-548, p. 9 (La.App. 3 Cir. 10/31/01), 803 So.2d 76, 83. As previously stated, the plaintiffs do not contend that Dr. Humphries failed to obtain consent to perform a colonoscopy. Instead, they argue there was no consent for the subsequent procedure—a polypectomy—that resulted in the perforation of Mr. Price's colon.

The jury's determinations with regard to informed consent are factual in nature, and it has long been recognized that we must review those findings under the manifest error/clearly wrong standard. The supreme court recently elaborated on the nature of review in an informed consent case in the following manner:

---

[8]Mr. Price does not deny his signature on either form. He testified that he simply does not remember signing either form.

In *Lugenbuhl [v. Dowling]*, 96-1575 at 11 [(La. 10/10/97)], 701 So.2d [447] at 453, another informed consent case, we stated: "An appellate court, in reviewing a jury's determination that a doctor failed to obtain the patient's informed consent, should focus on the duty of the doctor to provide material information to the patient under the circumstances of the particular case." Nothing that the jury apparently accepted the plaintiff's testimony, corroborated by that of his wife and daughter, and not the conflicting testimony of the doctor, we stated the evidence must be viewed in the light most favorable to the party who prevailed before the trier-of-fact. Likewise, in *Martin v. East Jefferson General Hospital*, 582 So.2d 1272, 1276-1277 (La.1991), we stated that deciding whether the plaintiff established by a preponderance of the evidence that the doctor's actions fell below the ordinary standard of care expected of physicians in his medical specialty and whether a causal relationship existed between the alleged breach of that standard and the injury sustained are determinations of fact which should not be reversed on appeal absent manifest error. Further,

> "[I]f the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been siting as the trier of fact, it would have weighed the evidence differently." *We have instructed the appellate courts that where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.*
> . . . .
>
> [E]xpert witnesses who are members of the medical profession are necessary sources of proof in medical malpractice actions . . . . *The determination of an expert's credibility is also a factual question subject to the manifestly erroneous/clearly wrong standard of review.* [Citations omitted; emphasis supplied.]

> *Martin*, 582 So.2d at 1277.

*Thibodeaux v. Jurgelsky*, 04-2004, pp. 28-29 (La. 3/11/05), 898 So.2d 299, 316.

While the testimony of Mr. Price and Dr. Humphries is in conflict on this issue of consent for the polypectomy, other evidence establishes that Mr. Price did receive specific information concerning the possibility of removing any polyps immediately after discovery. This evidence includes the pamphlet on January 4, 2002, as well as the two forms that Mr. Price executed on the morning of the surgery. We further note that three of the four expert witnesses testified that Dr. Humphries met the applicable

13

standard of care in obtaining Mr. Price's consent to both the colonoscopy and the polypectomy. The jury obviously accepted Dr. Humphries' version of the facts leading up to the procedure in returning a verdict finding no medical malpractice on his part. Based on the appropriate standard of review, we find no manifest error in the jury's factual determinations. Thus, as to Dr. Humphries, we find no merit in these assignments of error.

### Issue of Consent as it Applies to Dr. Bride

The plaintiffs argue that, even assuming the validity of the consent given to Dr. Humphries, Dr. Bride did not obtain consent from Mr. Price to perform a polypectomy. We note there is no question that Dr. Bride did not himself obtain Mr. Price's consent, either written or verbal. Although it is asserted that just prior to the performance of the polypectomy, Mr. Price verbally gave his consent to have Dr. Bride perform that procedure, Dr. Bride concedes, as the medical review panel acknowledged, that "[a] consent taken while a patient is under sedation, in and of itself, is not appropriate."

However, La.R.S. 40:1299.40(C) allows for other forms of consent when the explanation given to the patient includes in general terms the nature and purpose of the procedures and the known risks, if any, "of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures," and the patient is given the opportunity to ask questions concerning the procedures, which are answered in a satisfactory manner.

Here, Mr. Price received a colonoscopy handout on January 4, 2002, which explained that if polyps were found during the colonoscopy they might be removed. Further, Dr. Humphries testified that he informed Mr. Price on both January 4, 2002

14

and January 17, 2002, that if he found polyps during the colonoscopy he would have Dr. Bride, who is a gastroenterologist, remove them. Further, the wording of the second form makes Dr. Bride an "authorized physician" to perform the polypectomy:

> Consent: I hereby authorize and direct the designated authorized physician/group, together with associates and assistants of his/her choice, to administer or perform the medical treatment or surgical procedure described in Item 2 of this Consent Form, including any additional procedures or services as they may deem necessary . . . .

That is to say, Dr. Bride was an associate of Dr. Humphries who performed an additional procedure as deemed necessary by Dr. Humphries. *Larche v. Rodriguez*, 00-881(La.App. 4 Cir. 5/17/00), 765 So.2d 388, *writ denied*, 00-1817 (La. 9/22/00), 768 So.2d 1290. This written consent, along with Mr. Price's verbal consent given on January 4 and January 17, 2002, constitutes a valid consent under La.R.S. 40:1299.40(C).

There was conflicting expert testimony concerning compliance with the standard of care by Dr. Bride. Dr. Trowers stated that Dr. Bride failed to meet the applicable standard of care in gaining consent because "there is no documentation that the operator who performed the polypectomies had informed consent from the patient." In contrast, Dr. Person stated that Dr. Bride had met the standard of care for a patient giving informed consent. When there are conflicting expert opinions concerning compliance with the standard of case, the reviewing court will give great deference to the conclusions of the trier of fact. *Pinnick v. La. State Univ. Med. Ctr*, 30,263 (La.App. 2 Cir. 2/25/98), 707 So.2d 1050.

After reviewing the evidence presented, we conclude that the jury did not manifestly err in finding that the defendants established that it was more probable than not that Mr. Price consented to the polypectomy being performed by Dr. Bride if polyps were found during the colonoscopy, and that this met the applicable

standard of care. *Thibodeaux*, 898 So.2d 299. We find no merit in these assignments of error as to Dr. Bride.

### *ASSIGNMENT OF ERROR NUMBER SIX*

The plaintiffs contend that the trial court erroneously referred to the locality rule in La. R.S. 9:2794(A)(1) in its jury instructions.[9] However, the record contains no documentation of what objections the plaintiffs made to the trial court's proposed jury instructions. The plaintiffs amended the record to include the trial court's jury instructions, but did not include in the record what objections the plaintiffs made to those instructions. The only reference in the record before us to the plaintiff's objections to the jury instructions are the minutes of November 7, 2008, which state:

> The Court states that after having met with counsel in Chambers, and after the Jury Charges and Verdict Sheet having been completed, it will now allow counsel to state their objections to both.
> Mr. Broussard states his objections to the Jury Charges.
> Mr. Bergstedt states his objections to the Jury Charges.
> Mr. Cappel states his objections to the Jury Charges.
> The Court states its concerns about the Jury instructions as to the Verdict Sheet. Counsel respond and reach an agreement with the Court as to the changes which are to be made. The Court allows counsel to state their objections to the verdict sheet at this time.

From these minutes it appears that the plaintiffs objected to some jury instructions, but we cannot determine what those specific objections were. If a party does not specifically state "the matter to which he objects and the grounds of his objection," he cannot raise the trial court's jury instructions as an error on appeal. La.Code Civ.P. art. 1793(C). Further, it appears from the minutes of November 7, 2008, that

---

[9]Louisiana Revised Statutes 9:2794(A)(1) provides that the plaintiff has the burden of proving:

> The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.

16

all the parties agreed on certain changes to the jury instructions, and thereby waived any objections to them. Accordingly, we do not address this assignment of error.

### *ASSIGNMENT OF ERROR NUMBER SEVEN*

Finally, the plaintiffs assert that the jury erred in failing to award them damages. Our decisions on the prior assignments of error render this issue moot.

### DISPOSITION

For the foregoing reasons, we affirm the trial court judgment in all respects. We assess all costs of this appeal to the plaintiffs, James J. Price, IV, and Jena Broussard Price.

**AFFIRMED.**

CA 09-1076

JAMES JEFFERSON PRICE, IV, ET UX.

VERSUS

ERBE USA, INC., ET AL.

**COOKS, J., dissenting.**

I agree with the portion of the majority's opinion affirming the jury verdict finding Dr. Humphries obtained Mr. Price's consent. The facts were greatly in dispute, and the jury apparently accepted Dr. Humphries version that a conversation did occur between he and Mr. Price concerning the possibility of removing polyps if they were discovered. Further, the consent form, which Mr. Price signed, created a presumption in favor of Dr. Humphries that he advised Mr. Price of the risks connected with the proposed procedure and that Mr. Price had given an informed consent.

However, I dissent from the portion of the majority's opinion affirming the jury's verdict finding Mr. Price consented to the polypectomy performed by Dr. Bride. Normally, when there are conflicting expert opinions concerning compliance with the standard of care, the reviewing court will give great deference to the conclusions of the trier of fact. *Pinnick v. Louisiana State University Medical Center*, 30,263 (La.App. 2 Cir. 2/25/98), 707 So.2d 1050. In this case, Dr. Eugene Trowers testified Dr. Humphries and Dr. Bride failed to meet the applicable standard of care in gaining consent. He noted Dr. Bride's name was nowhere to be found on the consent form. He also stated in similar situations, when a "family practitioner would

have performed a screening procedure, [and] noted some polyps," it would have been appropriate for the family practitioner to have then *referred the patient to me to perform a colonoscopy with polypectomy at a later date.* (Emphasis added). In contrast, Dr. Stephen Person, who testified as an expert for Defendants, stated he has been "in a situation almost identical to what happened back on January 17th, 2002" and felt "perfectly at liberty to go forward with [the] polypectomy procedure based on the consent form." This case, however, does not turn on the conflicting testimony given by the two experts. The issue of consent here involves a pure application of the law.

Under the Uniform Consent Law, consent may be obtained in writing in accordance with Subsection A or under Subsection C it may be "other than in accordance with Subsection A," which presumably would mean verbal consent proven by parol evidence. A third method for securing the patient's consent is set forth in Subsection E, and provides "as an alternative [to Subsections A and C], a physician or other health care provider may choose to avail himself of the lists established by the secretary [of the Department of Health and Hospitals] pursuant to the provisions of this Subsection as another method by which to evidence a patient's consent to medical treatment." However, La.R.S. 40:1299.40(E)(7)(c) mandates that the duty of disclosing risks and hazards to the patient falls upon "the physician or other health care provider who will *actually* perform the contemplated medical or surgical procedure."

Plaintiffs maintain the "duty of disclosing risks and hazards to the patient" required by La.R.S. 40:1299.40(E)(7)(C) is imposed on the physician "who will actually perform the contemplated medical or surgical procedure." Dr. Bride, not Dr. Humphries, performed the polypectomy. Dr. Bride himself had a duty, as the physician actually performing the procedure, to inform Mr. Price about the risks of

the polypectomy. There was no written consent *obtained by Dr. Bride* under Section A of the Uniform Consent Statute. And there was no valid verbal consent obtained by Dr. Bride under either Section C or Section E of the statute.

I also find it was error for the trial court not to charge the jury on the law found in Subsection E(7) of the La.R.S. 40:1299.40. As set forth earlier, that section establishes in order for a physician to be covered by Subsection E, "the physician . . . who will actually perform the contemplated medical or surgical procedure" has to fulfill the duties required in Subsection E. Defense counsel successfully convinced the trial court, over Plaintiffs' objection, to exclude any reference to Subsection E(7) in its jury charge. This was error and resulted in the jury receiving an incomplete and inaccurate jury charge.

Further, I believe the jury may have erroneously believed it was imperative that the polypectomy be informed immediately. Despite the absence of any testimony that the polypectomy needed to be performed on January 17, and Dr. Bride's specific testimony that polyps do not need to be removed immediately when discovered, Dr. Humphries' counsel told the jury in his closing:

> And, remember, which has been lost in this filing of the lawsuit and alleging negligence on his doctors is that of those doctors, those procedures saved Mr. Price's life. If that polypectomy had not been performed, Mr. Price wouldn't be with us. He would have developed colon cancer, and he would have died.

The performance of the polypectomy cannot be said to have been an emergency procedure. Dr. Humphries had already ended the screening procedure for which his services were retained when Dr. Bride was called in to perform the polypectomy. There was no immediate threat to the health of Plaintiff that required the immediate performance of the polypectomy. In *Pizzalotto v. Wilson*, 437 So.2d 859 (La.1983), the Louisiana Supreme Court established the rule that a physician may not act beyond his patient's authorization, except when a situation seriously threatens the health or

life of the patient. That exception represented the one instance where a patient's consent would be implied. The court in *Pizzalotto* found even though the patient there would require a hysterectomy within six to eight days in order to avoid danger to her health, it was not an emergency which warranted the performance of a hysterectomy without consent. Dr. Bride's belief that a polypectomy would benefit Mr. Price does not, under *Pizzalotto*, legally justify its performance without the patient's consent.

Dr. Bride also attempts to "piggyback" on the consent form Dr. Humphries had Mr. Price sign just prior to the beginning of the colonoscopy. First, he argues the wording of the consent form makes him an "authorized physician" to perform the polypectomy. In support of this argument, he cites the following provision of the consent form:

> Consent: I hereby authorize the designated authorized physician/group, together with associates and assistants of his/her choice, to administer or perform the medical treatment or surgical procedure described in Item 2 of this Consent Form, including any additional procedures or services as they may deem necessary. . .

Dr. Bride argues he was an associate of Dr. Humphries who performed an additional procedure as deemed necessary by Dr. Humphries. Thus, he argues the consent form, which by law granted a presumption of valid consent to Dr. Humphries to perform the screening colonoscopy, applies to him in his performance of the polypectomy. I disagree. The reference to associates and assistants in the consent form is meant to apply to nurses and surgical assistants on the contemplated procedure, not another doctor brought in after the original proceeding is stopped, to perform an additional procedure.

Dr. Bride also argues the valid consent obtained by Dr. Humphries for the colonoscopy includes consent for the polypectomy. In support of this, he cites *Larch v. Rodriguez*, 00-881(La.App. 4 Cir. 5/17/00), 765 So.2d 388, *writ denied*, 00-1817

(La. 9/22/00), 768 So.2d 1290, for the proposition that a valid consent for one procedure includes consent for another. I agree *Larche* is insightful, but find it is supportive of Plaintiffs' arguments rather than those of Defendants. In that case, James Larche had deformities affecting both his right foot and his left foot. He sought medical treatment for his left foot from Dr. Sanchez. Dr. Sanchez referred him for treatment to Dr. Rodriguez, an orthopedic surgeon. Dr. Rodriguez recommended surgery.

Later after consulting with Dr. Buckley, another orthopedic surgeon, Larche signed a consent form stating that the procedure to be performed was "multiple tarsal osteotomies and arthrodesis." At that time, Dr. Buckley was a resident working under the supervision of Dr. Rodriguez. Drs. Rodriguez and Buckley then performed surgery on Larche's left foot.

Larche complains that neither Dr. Rodriguez nor Dr. Buckley explained that a triple arthrodesis was a possible procedure. Larche filed suit against Dr. Rodriguez, alleging that he failed to obtain his consent for the triple arthrodesis. The claims were considered by a medical review panel, and it unanimously concluded that Dr. Rodriguez had obtained Larche's consent to the triple arthrodesis, through the written consent signed by Larche.

Larche argued Dr. Rodriguez performed a procedure to which Larche had not consented. Among his arguments was that the presumption of consent derived from a signed consent form did not apply to the facts of his case because Dr. Buckley, not Dr. Rodriguez, obtained Larche's signature on the consent form and that Dr. Rodriguez actually performed the procedure. Larche noted the law requires that the actual medical professional performing the procedure has a duty under La.R.S. 40:1299.40 to obtain informed consent from the patient. While acknowledging it is the law that the actual physician performing the procedure must obtain consent, the

court found the facts in this case allowed Dr. Rodriguez the benefits of the presumption because Dr. Buckley *actually participated* in Larche's surgery and was acting at the direction of Dr. Rodriguez. Thus, the appellate court saw "no reason to deny Dr. Rodriguez the benefits of the presumption." *Id*. at 389.

In the present case, Dr. Humphries, who obtained Mr. Price's written consent, did not participate in the polypectomy, and was not even in the room when it was performed. Thus, the facts here are distinguishable from those in *Larche.*

Defendants also argues since Mr. Price did not specifically testify that he would not have had the polypectomy procedure if he had been made aware of it pre-operatively, he fails on the causation issue. They cite *Lugenbuhl v. Dowling*, 96-1575, p. 12 (La.10/10/97), 701 So.2d 447, 454, wherein the Louisiana Supreme Court noted a Plaintiff in "a lack of informed consent case must prove not only that the physician failed to disclose all material information, but also that there was a causal relationship between the doctor's failure and the damages claimed by the patient." Specifically, they note *Lugenbuhl* provides a plaintiff must "prove that a reasonable patient in the plaintiff's position would not have consented to the treatment or procedure, had the material information and risks been disclosed." *Id.* Defendants urge Mr.Price's failure to specifically state he would have refused the polypectomy had he been informed of it on Januray 17, 2002 is fatal to the issue of causation. I do not agree.

As Plaintiffs point out, this is not a lack of *informed consent* case, but a no consent case. Plaintiffs do not object to any risks not being disclosed, or whether there was adequate disclosure. Instead, they contend there was never any consent to the polypectomy being performed or to Dr. Bride touching his body in any manner. The *Lugenbuhl* court specifically recognized a patient has an absolute right, for whatever reason, to prevent unauthorized intrusions and treatments upon his person.

In footnote 5 of its opinion, the Court stated:

> On the other hand, one can hardly argue that it is not below the appropriate standard of care for a doctor or nurse to perform a medical procedure *without obtaining any consent*.

*Id.* at 452. (Emphasis added)

Dr. Bride's failure to obtain valid consent from Mr. Price caused him to be subjected to potential risks which unfortunately materialized, and which caused him injury. Dr. Bride had a duty under the law, as the physician performing the polypectomy, to inform Mr. Price of the risks inherent in that procedure. He breached that duty, and thus is liable to Plaintiffs for the injuries which they suffered.

Therefore, I dissent from the majority's opinion affirming the jury's verdict finding Mr. Price consented to the polypectomy performed by Dr. Bride. Mr. Price is entitled to damages for the injuries he incurred as a result of Dr. Bride's breach of duty to obtain his valid consent.